Charles G. VOGEL and Kathleen A. Vogel, Plaintiffs,

v.

Gilbert RUSSO, an individual d/b/a Russo Builders, and Milwaukee Mutual Insurance Company, Defendants-Third-Party Plaintiffs-Respondents,

v.

WEST BEND MUTUAL INSURANCE COMPANY, Third-Party Defendant-Appellant-Petitioner,

INTERSTATE HEATING COMPANY, Betty Limbach, f/d/b/a Limbach Construction Company and ABC Insurance Company, Third-Party Defendants.

Supreme Court

*No. 97–2192. Oral argument January 5, 2000.—Decided July 7, 2000.*

2000 WI 85

(Also reported in 613 N.W.2d 177.)

For the third-party defendant-appellant-petitioner, there were briefs by *James J. Pauly, Rollin E. Krafft, Christopher C. Zwygart* and *Law Offices of James J. Pauly*, West Bend, and oral argument by *James J. Pauly*.

For the defendants-third-party plaintiffs-respondents there was a brief by *Gregory J. Cook, Patti J. Kurth,* and *Kasdorf, Lewis & Swietlik, S.C.,* Milwaukee, and oral argument by *Gregory J. Cook*.

¶ 1. DIANE S. SYKES, J. This case presents an insurance coverage dispute and requires us to determine whether a comprehensive general liability insurance policy provides coverage for diminution in value of a home that resulted from a subcontractor's faulty masonry work. The appeal arises out of a breach of contract and negligence action filed by Charles and Kathleen Vogel against Russo Builders, the general contractor that built their home, and Russo's insurer, Milwaukee Mutual Insurance Company. Russo had subcontracted the masonry work on the Vogels' home to Limbach Construction, and impleaded Limbach and its insurer, West Bend Mutual, for contribution. Limbach was insured under a standard comprehensive general liability policy. The jury found for the Vogels and awarded damages, measured under two alternate theories: cost of repair and diminution in value.

¶ 2. After trial, the circuit court adopted the diminution in value measure of damages, and entered judgment accordingly. On the coverage issue, the court concluded that West Bend's insurance policy provided coverage for diminution in value damages, and included in the order for judgment an award for contribution in favor of Russo and its insurer and against Limbach and West Bend. The court of appeals affirmed, and we accepted review. Because we conclude that most of the damages awarded by the jury are excluded by West Bend's insurance policy, we reverse.

¶ 3. In 1987, Charles and Kathleen Vogel hired general contractor Gilbert Russo, d/b/a Russo Builders, to build their new home, at a cost of approximately $400,000 (excluding the lot). Russo subcontracted the masonry work to Michael Limbach, d/b/a Limbach Construction Company. Limbach performed all of the foundation work, the flat work, concrete work and

brick work on the home. Limbach also constructed the chimney and installed the home's footings, the basement floor, drain tiles, exterior brick, and the masonry fireplaces.

¶ 4. In mid-August of 1988, construction was complete and the Vogels moved in. They soon began noticing problems. During the winter of 1988–89, the Vogels noticed moisture in the home. Water spots appeared on the walls in the east bedroom. Efflorescence, a whitish salt appearance resulting from water penetration, appeared around the perimeter of the basement. The Vogels also noticed other stains from water penetration

¶ 5. In late 1990 or early 1991, the home's chimney caps crumbled and needed to be replaced. In the summer of 1991, the Vogels noticed more water penetration in the east bedroom, a problem that persisted through the next several years, culminating when the Vogels returned from a vacation in March of 1993 and discovered wet carpeting below the bedroom door jamb, water stains on the ceiling, and water running down the side of the back stairway. Subsequent heavy rains caused more water to leak into the east bedroom, down a wall, and into the kitchen below, where it curled the wallpaper, warped a baseboard and eventually pooled in the basement.

¶ 6. The Vogels also had trouble with their chimneys. Because the dampers would not open, Michael Limbach returned to the home to remove excess mortar from the living room fireplace. Eventually, the Vogels hired an engineering consultant who examined the home and advised them not to use their fireplaces.

¶ 7. The same consultant found a number of other problems with the home's masonry. The brick head joints were incompletely filled. Limbach had used

28 gauge wall ties to hold the brick in place, even though the building code required 22 gauge wall ties, approximately twice the thickness of those Limbach used. According to the consultant, if the 28 gauge ties corroded or broke off, the walls of the home could collapse. Limbach also failed to install weep holes in the brick, which are designed to let water escape the brick and to provide ventilation to keep the brick and underlying wood frame dry.

¶ 8. Ultimately, the Vogels sued Russo for breach of contract and negligence in the construction of their home. Russo and his insurer, Milwaukee Mutual Insurance Company, in turn brought a third-party action against Betty Limbach,[1] f/d/b/a Limbach Construction Company, and its insurer, West Bend Mutual Insurance Company. Milwaukee Mutual also impleaded Interstate Heating,[2] the subcontractor that installed the heating and cooling systems in the home, which were also problematic.

¶ 9. Limbach was insured by West Bend under a standard comprehensive general liability policy; however, West Bend denied that its policy covered the claims asserted in the third-party complaint and Betty Limbach retained separate counsel. West Bend then filed for declaratory judgment and moved for partial summary judgment on the coverage issue. The Circuit Court for Ozaukee County, the Honorable Joseph D. McCormack, held that the motion was premature and that the coverage issue would be determined after trial.

---

[1] Betty Limbach is the widow of Michael Limbach, the owner and operator of Limbach Construction Company, a sole proprietorship. Michael Limbach died in 1993 before the Vogels began this suit.

[2] Interstate Heating settled with Russo and Milwaukee Mutual during the trial and is not a party to this appeal.

¶ 10. At trial, the jury was asked to decide whether Russo breached its contract and was negligent in the construction of the Vogels' home, and whether Limbach and Interstate Heating were negligent for their part in the construction of the Vogels' home. The jury was also asked to consider two separate damages measures: cost of repair (itemized as to the general and subcontractors), and diminution in value. The jury found that Russo breached his contract with the Vogels and that Russo, Limbach and Interstate Heating each were negligent in the construction of the home. The jury apportioned negligence as follows: 30 percent to Russo, 60 percent to Limbach and ten percent to Interstate Heating.

¶ 11. As to the damages questions on the special verdict, the jury determined diminution in value and cost of repair to be the same: $320,000. As to the cost of repair measure of damages, the jury itemized the $320,000 as follows: $235,100 to repair Limbach's masonry work; $70,700 to repair work performed by Russo, Interstate Heating and other subcontractors; $10,700 to repair interior water damage attributable to Interstate Heating; and $3,500 to repair interior water damage attributable to Limbach's work.

¶ 12. The circuit court decided the coverage dispute between Milwaukee Mutual and West Bend on motions after verdict. The court concluded that Limbach's shoddy masonry work was so bad—essentially the equivalent of gross negligence—that it constituted "property damage" within the meaning of the coverage language of West Bend's policy. In the circuit court's view, "Limbach's actions were property damage as much as they would have been had he accidentally run into the building with a bulldozer." The court then adopted the diminution in

value measure of damages, concluding that, in light of testimony that the Vogels' home was essentially a "tear-down," repair or replacement would constitute economic waste. The court ordered judgment entered on the jury's verdict, including an award of $192,000 in favor of Russo and Milwaukee Mutual for contribution against Limbach and West Bend (60 percent of $320,000).

¶ 13. West Bend appealed, and the court of appeals affirmed in an unpublished decision. The court of appeals focused on the circuit court's choice of diminution in value as the appropriate measure of damages, and applied *Sola Basic Industries, Inc. v. United States Fidelity & Guaranty Co.*, 90 Wis. 2d 641, 654, 280 N.W.2d 211 (1979), to conclude that because the entire home was worthless, "property damage" within the meaning of West Bend's policy had occurred. We accepted review.

¶ 14. This case involves the interpretation of an insurance contract and thus presents a question of law that we review de novo. *Katze v. Randolph & Scott Mut. Fire Ins. Co.*, 116 Wis. 2d 206, 212, 341 N.W.2d 689 (1984). Judicial interpretation of a contract, including an insurance policy, seeks to ascertain and give effect to the intent of the contracting parties. *Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co.*, 2000 WI 26, ¶ 23, 233 Wis. 2d 314, 328, 607 N.W.2d 276; *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998). Insurance policies are construed as they would be understood by a reasonable person in the position of the insured. *Kremers-Urban Co. v. American Employers Ins. Co.*, 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984); *Hedtcke v. Sentry Ins. Co.*, 109 Wis. 2d 461, 487, 326 N.W.2d 727 (1982). How-

ever, we do not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium. *Wisconsin Label*, 233 Wis. 2d at ¶ 25; *Smith v. Katz*, 226 Wis. 2d 798, 807, 595 N.W.2d 345 (1999).

¶ 15. We note at the outset that, although the parties argue back and forth about the applicability of the economic loss doctrine, this is not in fact an economic loss doctrine case. The economic loss doctrine precludes recovery in tort of purely economic losses for the failure of a product or service to live up to contractual expectations. *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 245–46, 593 N.W.2d 445 (1999); *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis. 2d 910, 921, 437 N.W.2d 213 (1989). Where a product is defective or fails in its intended use, and is therefore diminished in value or causes purely economic loss to the purchaser (lost profits, for example), the economic loss doctrine applies, preserving the traditional distinction between tort and contract law and leaving the purchaser to his contract remedies. *Wausau Tile*, 226 Wis. 2d at 247–48 (citing *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871 (1986)).

¶ 16. Here, however, no one is claiming that the Vogels are precluded by the economic loss doctrine from recovering the damages awarded by the jury. The parties are fighting only about who pays. This is a coverage dispute between two insurance companies, governed by the language of the policy in question. While there are some theoretical overlaps with the case law involving the economic loss doctrine (because the cases sometimes also involve coverage questions), the economic loss doctrine is not really implicated here.

¶ 17. Comprehensive general liability (CGL) insurance policies like the one at issue in this case were developed by the insurance industry in 1940 and have been revised periodically since then; today, most are written on standardized forms. *Wisconsin Label*, 233 Wis. 2d at ¶ 27 n.3 (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993) and Laurie Vasichek, Note, *Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy*, 68 Minn. L. Rev. 795, 798–99 & n.14 (1984)). Coverage under a CGL policy does not extend to "business risks"—risks relating to the repair or replacement of the insured's faulty work or products, or defects in the insured's work or product itself. *Bulen v. West Bend Mut. Ins. Co.*, 125 Wis. 2d 259, 264–65, 371 N.W.2d 392 (Ct. App. 1985).

> The risk intended to be insured [in a CGL policy] is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or *damage to property other than to the product or completed work itself,* and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Id.* (quoting *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 791 (N.J. 1979))(emphasis added). A CGL policy's sole purpose is to cover the risk that the insured's goods, products, or work will cause bodily injury or damage to property *other than* the product or the completed work of the insured. *Jacob v. Russo Builders*, 224 Wis. 2d 436, 447, 592 N.W.2d 271 (Ct. App. 1999)(*Jacob II*). A CGL policy, therefore, is not a performance bond. *Id.* at 448; *Wisconsin Label*, 233 Wis. 2d at ¶ 58.

¶ 18. The relevant language of the CGL policy West Bend issued to Limbach is as follows:

### COVERAGE E—BUSINESS LIABILITY

The Company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of **bodily injury**, **property damage**, or **personal injury** caused by an **occurrence** to which this insurance applies.

"Property damage" is defined as:

(a) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (b) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

"Occurrence" is defined as:

an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**. . .

The policy also contains a business risk exclusion:

### BUSINESS LIABILITY EXCLUSIONS

Under Coverage E, this policy does not apply: . . .

11. to damage to property: . . .

(b)(4) that particular part of any property, not on premises owned by or rented to the **insured.** . .

(iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured. . .

13. to **property damage** to the **named insured's products** arising out of such **products** or any part of such **products**.

¶ 19. The language of the policy is clear. It provides coverage for 1) physical injury to or destruction of tangible property resulting from a covered occurrence, including loss of use attributable to the injury or damage; and 2) loss of use of tangible property which has not been physically injured resulting from a covered occurrence. The business liability or "business risk" exclusion excludes coverage for repair or replacement damages associated with the insured's faulty workmanship or property damage to the insured's own work or product.

¶ 20. The foregoing language of West Bend's CGL policy has already been construed to exclude coverage for the lion's share of the damages awarded in this case. In *Jacob II*, a case involving another victim of the Russo-Limbach home building operation, the court of appeals held that the West Bend CGL policy, by virtue of the coverage and exclusion language quoted above, did not provide coverage for the cost of repairing or replacing Limbach's defective work. *Jacob II*, 224 Wis. 2d at 448.

> *Bulen* instructs that CGL coverage exists for tort damages but not for economic loss resulting from contractual liability. As we have noted, the parties agree (as do we) that the replacement and repair of Limbach's masonry product is economic loss to the Jacobs based on Limbach's contractual liability and is not covered under the West Bend CGL policy. Were it otherwise, West Bend's CGL policy would truly have been converted to a performance bond contrary to *Bulen*.

*Id.*

¶ 21. The court of appeals in *Jacob II* went on to analyze whether other categories of the homeowners' damages were covered under West Bend's CGL policy, ultimately concluding that those relating directly to the repair or replacement of Limbach's defective work were not covered, but those relating to "collateral damage" to the homeowners' "other property" were.

> [O]ther categories of the Jacobs' damages such as relocation costs, temporary repairs, loss of use and enjoyment of the residence, and repair of the interior of the residence are not directly the consequence of repairing or replacing Limbach's defective work. Rather, they represent collateral damage to the Jacobs' "other property" (the interior of the residence) and the costs associated with addressing and correcting that situation. As we have noted, these represent economic losses which can be recovered in tort, and, as such, they are covered by West Bend's CGL policy.

*Id.* at 451. This case concerns the same CGL policy, and we adopt the court of appeals' interpretation of it from *Jacob II*.

¶ 22. Applying that interpretation here, it is clear that the policy does not cover most of the jury's

515

damages award. The jury in this case was asked to evaluate the Vogels' damages on the basis of two measures: diminution of value and cost of repair. It did so, awarding the same amount, $320,000, by each measure. The jury was also asked to separately itemize the cost of repair damages, and in so doing, assessed the cost to repair Limbach's masonry work at $235,100. The jury also found Limbach responsible for $3,500 worth of water damage to the interior of the Vogels' home. If we were applying the *Jacob II* analysis to the cost of repair measure of damages, the $235,100 cost to repair Limbach's masonry work would not be covered by West Bend's CGL policy, but the $3,500 attributable to "collateral damage" caused by Limbach would be.

¶ 23. But the circuit court found the cost of repair measure of damages to be economically wasteful and adopted the diminution of value measure instead. The election of this alternate measure of damages, however, does not change the nature and character of the damages or provide coverage under the CGL policy where it otherwise does not exist. The bulk of the damages awarded by the jury in this case were repair or replacement damages attributable to Limbach's faulty workmanship, for which the CGL policy clearly does not provide coverage. The circuit court's characterization of Limbach's negligence as tantamount to gross negligence at common law is certainly understandable under the facts of this case, but it does not convert otherwise uncovered damages into covered damages under the insurance policy.

¶ 24. The court of appeals in this case relied upon *Sola Basic*, 90 Wis. 2d at 641, to conclude that "the diminution in value determination reflects that the entire home was worthless" and therefore "property damages within the policy occurred." *Vogel v.*

*Russo*, No. 97–2192, unpublished slip op. at 6 (September 16, 1998). In *Sola Basic* we interpreted the standard CGL policy in use at the time and held that "the term 'property damage' to tangible property does not necessarily require physical damage [and] tangible property may be damaged in that it is diminished in value or made useless, irrespective of actual physical injury to the tangible property." *Sola Basic*, 90 Wis. 2d at 653–54.

¶ 25. However, as the court of appeals in *Jacob II* noted, "[t]he standard CGL policy language has since changed. It now defines 'property damage' as '*physical* injury to or destruction of tangible property.' (Emphasis added.) Thus, the court's reasoning in *Sola Basic* does not apply to the definition of property damage in West Bend's policy." *Jacob II*, 224 Wis. 2d at 454 n.9; *see also, Wisconsin Label*, 233 Wis. 2d at ¶ 48. We agree with the court of appeals in *Jacob II* that *Sola Basic* does not apply.[3]

¶ 26. Nor do the damages in this case constitute "loss of use" damages under the insurance policy. There is no evidence that the Vogels ever lost the use of their home, and the jury was not asked to and did not award any loss of use damages. Diminution in value—even to the point of worthlessness—is not the same as "loss of use" under the insurance policy, which by its plain

---

[3] As we noted earlier this year in *Wisconsin Label Corp. v. Northbrook Property & Casualty Insurance Co.*, 2000 WI 26, ¶ 47, 233 Wis. 2d 314, 607 N.W.2d 276, the case relied upon most heavily in *Sola Basic*, *Hauenstein v. St. Paul-Mercury Indemnity Co.*, 65 N.W.2d 122 (Minn. 1954), was later declared inapplicable to current CGL policies for essentially the same reason—because the property damage definition in standard CGL policies has changed. *See Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 756 (Minn. 1985).

language contemplates some sort of loss of use in fact, not a reduction in value. In any event, as we have noted above, the diminution in value award in this case was simply an alternate measure of the cost of repair damages, and did not fundamentally recharacterize the nature of the harm in such a way as to trigger coverage under West Bend's CGL policy. "Diminution in value and cost of repair are not two separate harms—they are two different ways of measuring the same harm. If the harm. . .is not covered as measured by diminished value, it is not covered as measured by cost of repair." *New Hampshire Ins. Co. v. Vieira*, 930 F.2d 696, 701–02 (9th Cir. 1991) (citation omitted). The opposite is true as well.

¶ 27. The jury found Limbach responsible for two types of harm: the harm to the interior of the Vogel's home caused by the defective masonry work ($3,500 in damages), and the harm associated with the cost to repair the defective masonry work itself ($235,100 in damages). There clearly is no coverage for the latter; Milwaukee Mutual essentially concedes as much, arguing only that diminution in value is covered. And West Bend concedes coverage for the $3,500 in damage to the interior of the Vogels' home caused by the defective masonry work.

¶ 28. Insurance coverage does not come into being where it otherwise does not exist simply by virtue of a judicial election of an alternate measure of damages. The underlying harm—defective masonry work costing a substantial sum to repair—remains the same. West Bend's CGL policy covers only the collateral property damage associated with the defective masonry work ($3,500), not the defective masonry itself, the cost to repair it, or any effect on the home's value it may have had.

¶ 29. Therefore we conclude that the diminution in value to the Vogels' home was not covered by West Bend's CGL policy. Accordingly, we reverse.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded.

¶ 30. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. The majority opinion determines that diminution in value of the Vogels' home is not covered by the West Bend comprehensive general liability insurance policy because the damages do not constitute "property damage" or "loss of use" and are excluded under the business risk exclusion of the policy. Majority op. ¶¶ 19–21, 26. I disagree.

¶ 31. I agree with the circuit court and court of appeals that there was physical injury to tangible property other than Limbach's work product, namely the entire home, and that this injury constitutes property damage covered by the West Bend policy. The damage to the Vogels' home extended beyond damaged woodwork, flooring and carpeting. According to the engineering consultant, the walls could collapse and the ventilation was inadequate to keep the brick and wood frame dry. Majority op. ¶ 7. These problems have in turn affected and reduced the structural integrity of the home. Such a defective home can constitute "loss of use," which is explicitly defined in the policy as property damage.

¶ 32. The diminished value of the home reflects the fact that the home was beyond repair, that it was not saleable, and, therefore, was essentially useless. Diminution of value is merely a means of measuring

the damages sustained as a result of the property damage.

¶ 33. The business liability or business risk exclusion denying coverage for repair or replacement expenses associated with the insured's faulty workmanship or property damage to the insured's own work or work product does not come into play in this case. The property damage here is to the entire home caused by the faulty workmanship of the insured; thus, it falls outside the exclusion and is properly the subject of the policy.

¶ 34. For the reasons stated, I dissent.

¶ 35. I am authorized to state that Justice WILLIAM A. BABLITCH joins this dissent.