*263 SHIRLEY S. ABRAHAMSON, J.
1 87. (,dissenting). "Like the ever-expanding, all-consuming alien life form portrayed in the 1958 B-movie classic The Blob, the economic loss doctrine [continues] to be a swelling globule on the legal landscape of this state."[1]
¶ 88. In the instant case, the majority opinion expands the already swollen flow of economic loss jurisprudence into heretofore unknown territory, grafting the "integrated system" rule from the economic loss doctrine onto the analysis of two commercial general liability (CGL) insurance policies' definitions of "property damage" and "occurrence."
¶ 89. "Like the Blob, the more it eats, the more it grows."[2]
¶ 90. The insurance policies at issue provide coverage for losses due to "property damage" arising from an "occurrence" to two suppliers of probiotic bacteria:[3] Nebraska Cultures of California, Inc. and Jeneil Bio-tech, Inc. Nebraska Cultures is insured by Evanston Insurance Company. Jeneil is insured by Netherlands Insurance Company. For simplicity I will refer to the insurance policies simply as "Nebraska Cultures' policy" and "Jeneil's policy," or, collectively, as "the insurance policies."
¶ 91. The insureds, Nebraska Cultures and Je-neil, contracted with a third party, Nutritional Manufacturing, to supply one type of probiotic bacteria, Lactobacillus rhamnosus A (LRA) for incorporation *264 into probiotic tablets. After the bacteria was incorporated into tablets by Nutritional Manufacturing, the tablets were packaged and sold to a retailer by Phar-macal. The retailer to whom Pharmacal sold the packaged tablets discovered the tablets contained a different probiotic bacteria, Lactobacillus acidophilus (LA). As a result, the mislabeled tablets were withdrawn from the market and destroyed (with their packaging).
¶ 92. Pharmacal filed suit against Nebraska Cultures and Jeneil. Evanston Insurance Company and Netherlands Insurance Company sought to stay and bifurcate the proceedings. They asserted that no coverage existed under the insurance policies because the incorporation of the wrong probiotic ingredient into Pharmacal's probiotic tablets was not "property damage" caused by an "occurrence," and that even if it were, certain exclusions negated coverage. The majority opinion adopts the position of the two insurance companies.
¶ 93. I conclude that the court of appeals' interpretation of the insurance policies (an interpretation that does not import elements of the economic loss doctrine) is more persuasive than that of the majority opinion. As a result, I would affirm the decision of the court of appeals.
¶ 94. One of my chief concerns with the majority opinion is its incorporation of the "integrated system" analysis derived from the tort economic loss doctrine into the interpretation of insurance policies in Wisconsin.[4] The economic loss doctrine is a remedies principle *265 that bars recovery in tort for economic losses stemming from, among other things, a product's failure to perform up to expectations. See Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶¶ 34-35, 268 Wis. 2d 16, 673 N.W.2d 65 (citing Wausau Tile, Inc. v. Cnty. Concrete Corp., 226 Wis. 2d 235, 245-46, 593 N.W.2d 445 (1999)).
¶ 95. The majority opinion applies an "integrated system" analysis derived from the economic loss doctrine as explained in Wausau Tile, Inc. v. County Concrete Corp., 226 Wis. 2d 235, 250-52, 593 N.W.2d 445 (1999), a tort liability case (not a case interpreting an insurance policy), to the interpretation of insurance policies. Based on its "integrated system" analysis, rather than on the words of the policies, the majority opinion concludes there is no coverage under the insurance policies "because the incorporation of a defective ingredient into the . .. tablets did not damage other property and did not result in loss of use of property."[5]
¶ 96. I write separately to make two points.
¶ 97. First, reading elements of the economic loss doctrine in tort law into the interpretation of insurance policies is unwise and contrary to this court's prec *266 edent. As this court has previously stated: "The [economic loss] doctrine does not determine insurance coverage, which turns on the policy language." Am. Girl, 268 Wis. 2d 16, ¶ 6 (emphasis added).
f 98. Second, I agree with the court of appeals' interpretation of the text of the insurance policies without incorporating elements of the economic loss doctrine.
¶ 99. Under the text of the insurance policies, the incorporation of the wrong probiotic ingredient in Pharmacal's probiotic supplements was "property damage" caused by an "occurrence," and none of the insurance policies' exclusions negate coverage.
¶ 100. Accordingly, I would affirm the court of appeals' detailed and well-reasoned decision and hold that the insurance policies provide coverage.
HH
¶ 101. The language of a contract determines the rights and responsibilities of the parties to the contract.
¶ 102. The goal of a court in interpreting an insurance policy, a contract, is "to determine and carry out the intentions of the parties as expressed by the language of the insurance policy."[6]
¶ 103. "Insurance coverage depends upon the policy language, not the theory of liability." 1325 N. Van Buren, LLC v. T-3 Grp., Ltd., 2006 WI 94, ¶ 59, 293 Wis. 2d 410, 716 N.W.2d 822; see also Am. Girl, 268 Wis. 2d 16, ¶¶ 6, 35.
*267 ¶ 104. The majority opinion's analysis all but ignores this principle, beginning not by analyzing the language of the insurance policies — which define both "property damage" and "occurrence" — but by analyzing whether any such "property damage" was damage to "other property."[7]
¶ 105. This focus on damage to "other property" by the majority opinion is derived not from the language of the insurance policies (which do not refer to "other property") but rather from tort cases applying the economic loss doctrine. These economic loss cases refer to damage to "other property."
¶ 106. The economic loss cases state that the doctrine does not bar recovery in tort for "a product purchaser's claims of personal injury or damage to property other than the product itself "[8]
¶ 107. The "other than the product itself' concept is addressed in Wausau Tile. In that case, the economic loss doctrine was used to bar tort claims stemming from the expansion and cracking of concrete paving blocks because the damage was caused by the incorporation of defective aggregate and concrete into the paving blocks, an "integrated system."[9] The paving blocks were an "integrated system" because the components of the *268 paving blocks were integrated into a finished product and could not be separated from the finished product.[10]
¶ 108. The majority opinion in the instant insurance case states that the "integrated system" analysis in Wausau Tile, a tort liability case, "is necessary when evaluating coverage under a CGL policy because we must decide whether the product is to be treated as a unified whole or whether a defective component can be separated out such that the claimed damage constitutes damage to property other than the defective component itself."[11]
¶ 109. Applying an "integrated system" analysis, the majority opinion concludes that the tablets were an "integrated system" because the wrong probiotic bacteria, like the defective aggregate in Wausau Tile, was integrated into a finished product and could not be separated out after integration.[12] As a result, the majority opinion concludes that there was no "property damage" in the instant case.[13]
¶ 110. The majority opinion, however, ignores a critical distinction between Wausau Tile and the instant case.
¶ 111. Wausau Tile was a tort liability case applying the economic loss doctrine. It was not an insurance coverage dispute. Although an insurance policy in Wau-sau Tile covered "property damage" arising from an "occurrence," the Wausau Tile court was not addressing insurance issues; it did not decide whether the insurance policy in Wausau Tile provided coverage.[14]
*269 ¶ 112. The majority opinion treats Wausau Tile as an insurance policy case and reads the economic loss doctrine into the interpretation of insurance policy language. Wausau Tile does not compel the majority opinion's unwise and unprecedented approach.
¶ 113. Under the majority opinion's approach, the first step in evaluating a claim for "property damage" arising from an "occurrence" (at least when the "property damage" is caused by a defective product or component) is an "integrated system" analysis, not an interpretation of the language of the policies.
¶ 114. By conducting an "integrated system" analysis first, without regard to the underlying policy language, the majority opinion undercuts precedent. This court has held that the language of the policy, not the economic loss doctrine, determines insurance coverage.[15]
¶ 115. For example, in American Family Mutual Insurance Co. v. American Girl, Inc., 2004 WI 2, ¶¶ 6, 35-36, 268 Wis. 2d 16, 673 N.W.2d 65, this court held that even if "the economic loss doctrine may indeed [have] preclude[d] tort recovery," the economic loss doctrine "does not determine whether an insurance policy covers a claim, which depends instead upon the policy language."[16]
¶ 116. The majority opinion acknowledges our holding in American Girl and states that "the economic loss doctrine does not control a coverage dispute."[17] *270 Nonetheless, the majority opinion concludes that "the court of appeals did not perceive the importance of an integrated system analysis when deciding whether claimed damage arose from physical injury to tangible property other than to the LA."[18]
¶ 117. But how can an "integrated system" analysis be important to resolving whether there was "property damage" caused by an "occurrence" under insurance policies when the insurance policies define these words and do not invoke the economic loss doctrine or integrated system rule?
¶ 118. The majority opinion concludes that the importance of the "integrated system" analysis stems not from the language of the insurance policies, but from the risks intended to be insured by a CGL policy.[19] Unlike a performance bond, which insures against the risk another party to a contract will fail to perform their obligations, the majority opinion states that a CGL policy is intended to insure against" 'the risk that the insured's goods, products, or work will cause bodily injury or damage to property other than the product or the completed work of the insured.' "[20]
¶ 119. I agree, however, with Professor Ellen S. Pryor's rejection of this argument in her article entitled The Economic Loss Rule and Liability Insurance, 48 Ariz. L. Rev. 905 (2006). As Professor Pryor points out, insurers have done a "poor job of implementing the economic loss rule through general insuring language," *271 and the general language of CGL policies "poorly expresses" the differences between CGL policies and performance bonds.[21]
¶ 120. In short, the majority opinion ignores the language of the insurance policies, our accepted rules of interpreting insurance policies, and Wisconsin precedent.
HH HH
¶ 121. I turn now to the text of the insurance policies — "property damage," "occurrence," and exclusions — without importing elements of the economic loss doctrine.
¶ 122. The majority opinion acknowledges that in interpreting an insurance policy, "[t]he reasonable expectations of coverage of an insured should be furthered by the interpretation given." Frost ex rel. *272 Anderson v. Whitbeck, 2002 WI 129, ¶ 20, 257 Wis. 2d 80, 654 N.W.2d 225. The majority opinion never applies this rule. Wouldn't an objectively reasonable insured conclude it had insurance coverage in the instant case?
¶ 123. I agree with the court of appeals' interpretation of the insurance policies, and, like the court of appeals, I would hold that coverage exists.
¶ 124. Both insurance policies extend coverage for "property damage" caused by an "occurrence."[22] "Property damage" and "occurrence" are commonly used terms in commercial general liability policies, and the insurance policies contain similar definitions for both terms. As I noted above, neither definition refers to "other property" or incorporates the economic loss doctrine.
¶ 125. I agree with the court of appeals' decision that " [a] product is physically injured by the incorporation of a defective, faulty, or inadequate part that renders the other components or the whole unusable."[23]
¶ 126. In the instant case, by incorporating the wrong probiotic ingredient, the tablets were physically altered in a material way — the correct ingredients were intermingled with the wrong probiotic — and that alteration rendered the tablets, other ingredients and all, unusable.[24]
*273 ¶ 127. This court has not addressed whether the incorporation of a defective, faulty, or inadequate part that renders the whole unusable constitutes "property damage." Decisions from other jurisdictions are instructive.[25] The court of appeals correctly turns to cases from other jurisdictions to support its conclusion.
¶ 128. For example, the court of appeals cited National Union Fire Insurance Co. of Pittsburgh v. Terra Industries, Inc., 346 F.3d 1160 (8th Cir. 2003), and Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc., 78 Cal. App. 4th 847, 865 (Ct. App. 2000).
¶ 129. In National Union Fire, the federal Eighth Circuit Court of Appeals addressed whether, under Iowa law, the incorporation of adulterated carbon dioxide into carbonated beverages was "property damage" caused by an "occurrence." The federal court, relying on cases involving other adulterated products, concluded that "the incorporation of contaminated carbon dioxide into consumer beverages constitutes an 'occurrence' resulting in 'property damage1. .. ."[26]
¶ 130. Similarly, in Shade Foods, the California Court of Appeal concluded that the incorporation of almonds containing wood splinters into nut clusters for cereal was "physical injury to tangible property . . . ."[27] The Shade Foods court determined that "the presence of wood splinters in the diced roasted almonds caused *274 property damage to the nut clusters and cereal products in which the almonds were incorporated."[28]
¶ 131. I am persuaded by the court of appeals' analysis of these and other cases that a product is physically injured "by the incorporation of a defective, faulty, or inadequate part that renders the other components or the whole unusable."[29]
¶ 132. I turn next to whether the physical injury in the instant case was caused by an "occurrence." I agree with the court of appeals and conclude that there was an "occurrence."
¶ 133. Both policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[30]
¶ 134. An "accident" is not defined in the policies, but this court has defined an "accident" within an insurance policy as " an event or condition occurring by chance or arising from unknown or remote causes."[31]
¶ 135. In Western Casualty & Surety Co. v. Budrus, 112 Wis. 2d 348, 352-53, 332 N.W.2d 837 (Ct. App. 1983), the court of appeals held that there was an "occurrence" within the meaning of a CGL policy when a party negligently sold incorrectly tagged seed to another. The court of appeals concluded that "the neg *275 ligent act of selling the mistagged seed, which caused the damage" was an "occurrence" within the meaning of the policy.
¶ 136. I agree with the court of appeals in the instant case that, like providing the wrong seed in Budrus, providing the wrong probiotic bacteria was an "occurrence."[32]
¶ 137. The majority opinion concludes that under California law "Jeneil's provision of a defective ingredient may have been occasioned by negligence; however, Jeneil deliberately supplied the ingredient to Nebraska Cultures, which, in turn, supplied the ingredient to Nutritional Manufacturing. Moreover, Jeneil intended the ingredient to be incorporated into the tablets. Given the deliberate nature of these actions, the provision of a defective ingredient cannot be said to constitute an 'occurrence' under California law."[33]
¶ 138. The majority opinion is obviously erroneous in this respect. An insured's intentional conduct that results in unintended consequences can be an "accident" under an insurance policy. As Professor Pryor explains, " [i]f the insured intended the act that caused the injury, is this enough to take the claim outside the definition of accident? The answer is universally, and properly, no. To read the definition of accident so narrowly would exclude all but inadvertent acts, and would exclude much of the realm of negligent acts causing personal injury."[34]
¶ 139. Finally, the majority concludes that the policies' exclusions for "impaired property" negate coverage.[35]
*276 ¶ 140. Jeneil's policy excludes coverage for " '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of," among other things, deficiencies in "your product" or "your work" or the failure to perform a contract.[36]
¶ 141. "Impaired property" is defined in Jeneil's policy (with emphasis added) as follows:
8. "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or less useful because:
a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
b. You have failed to fulfill the terms of a contract or agreement;
if such property can be restored to use by:
a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
b. Your fulfilling the terms of the contract or agreement.
¶ 142. The majority opinion's conclusion that this exclusion negates coverage rests on its erroneous conclusion (based on its application of the integrated system rule derived from the tort economic loss doctrine) that there was no physical injury to tangible property in the instant case.[37]
¶ 143. I agree, however, with the court of appeals that this exclusion is inapplicable. "A product is physically injured by the incorporation of a defective, faulty, or inadequate part that renders the other components or the whole unusable."[38]
*277 * * * *
¶ 144. I disagree with the majority opinion's unwise and unprecedented application of the "integrated system" analysis derived from the tort economic loss doctrine to an interpretation of insurance policies. The (often incoherent) "Blob" of the economic loss doctrine should not be read into insurance policy interpretation. Instead, the court should follow its prior decisions holding that "[t]he [economic loss] doctrine does not determine insurance coverage, which turns on the policy language." Am. Girl, 268 Wis. 2d 16, ¶ 6.
¶ 145. Because I conclude, as did the court of appeals, after analyzing the policy language without importing principles from the economic loss doctrine, that there was "property damage" caused by an "occurrence" in the instant case and that none of the policies' exclusions negates coverage, I would affirm the decision of the court of appeals.
¶ 146. Finally, I add an additional note about the majority opinion.
¶ 147. The majority opinion states that "ANNETTE KINGSLAND ZIEGLER, J. and REBECCA G. BRADLEY, J., did not participate." Justice Annette Kingsland Ziegler advised the parties and the justices of this court that she withdrew from further participation.[39] Recusal of a justice is a significant issue for the parties and this court. Why does the majority opinion not state that Justice Ziegler withdrew from further participation?
*278 ¶ 148. For the reasons set forth, I dissent and write separately.
¶ 149. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

 Grams v. Milk Prods., Inc., 2005 WI 112, ¶ 57, 283 Wis. 2d 511, 699 N.W.2d 167 (Abrahamson, C.J., dissenting).

 1325 N. Van Buren, LLC v. T-3 Grp., Ltd., 2006 WI 94, ¶ 69, 293 Wis. 2d 410, 716 N.W.2d 822 (Bradley, J., dissenting).

 Probiotics are bacteria and yeasts with beneficial effects on health, particularly digestion.

 Although California law may have a role in the instant case, I question the majority opinion's application of the "grouping-of-contacts" choice of law analysis. The only contacts that the majority opinion notes are that the Netherlands policy was issued to Jeneil in Wisconsin and the Evanston policy was *265 issued to Nebraska Cultures in California. Majority op., ¶ 16. The majority opinion does not analyze other contacts that may be relevant.
The majority opinion's discussion of choice of law should not be read as a complete or exhaustive application of Wisconsin's choice of law rules; the majority opinion is cursory. See Drinkwater v. Am. Family Mut. Ins. Co., 2006 WI 56, ¶¶ 32-64, 290 Wis. 2d 642, 714 N.W.2d 568 (reviewing the "checkered past" of Wisconsin's choice of law jurisprudence and discussing the principles that drive choice of law analyses in Wisconsin).
In any event, the majority opinion's interpretation of California law is suspect.

 Majority op., ¶ 3.

 Day v. Allstate Indem. Co., 2011 WI 24, ¶ 27, 332 Wis. 2d 571, 798 N.W.2d 199 (citing Folkman v. Quamme, 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857).

 Majority op., ¶¶ 24-26. Wisconsin case law interprets and applies these words in insurance policies.

 Wausau Tile, Inc. v. Cnty. Concrete Corp., 226 Wis. 2d 235, 247, 593 N.W.2d 445 (1999) (citations omitted) (emphasis added). In other words, if a defective component of an integrated system causes damage to that system, that damage is not compensable in tort. Wausau Tile, 226 Wis. 2d at 249 ("Damage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' which precludes the application of the economic loss doctrine.") (citations omitted).

 Wausau Tile, 226 Wis. 2d at 249-253.

 Wausau Tile, 226 Wis. 2d at 251.

 Majority op., ¶ 28.

 See majority op., ¶¶ 34-35.

 See majority op., ¶ 35.

 Wausau Tile, 226 Wis. 2d at 268 n.19 (" [I]t is not necessary for us to decide precisely which property damage is covered under the policy . . ..").

 Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶¶ 6, 35, 268 Wis. 2d 16, 673 N.W.2d 65.

 This court reaffirmed American Girl's approach in 1325 N. Van Buren, LLC v. T-3 Grp., Ltd., 2006 WI 94, ¶ 59, 293 Wis. 2d 410, 716 N.W.2d 822, noting that "although the economic loss doctrine may limit a party to contract rather than tort remedies, it does not determine insurance coverage."

 Majority op., ¶ 32.

 Majority op., ¶ 32.

 Majority op., ¶¶ 25-26 & n.8.

 Majority op., ¶ 26 (quoting Vogel v. Russo, 2000 WI 85, ¶ 17, 236 Wis. 2d 504, 613 N.W.2d 177, abrogated in part on other grounds by Ins. Co. of N. Am. v. Cease Elec., Inc., 2004 WI 139, ¶ 25 n.6, 276 Wis. 2d 361, 688 N.W.2d 462).

 See Ellen S. Pryor, The Economic Loss Rule and Liability Insurance, 48 Ariz. L. Rev. 905, 906, 920 (2006).
The application of the economic loss doctrine to insurance policies is a developing issue. See, e.g., Ralph C. Anzivino, The Economic Loss Doctrine: Distinguishing Economic Loss from Non-Economic Loss, 91 Marq. L. Rev. 1081, 1116 (2008) (arguing for adopting the integrated system rule in insurance policy interpretation).
See also Restatement (Third) of Torts: Liability for Economic Harm § 6 cmt. c (Tentative Draft No. 2, 2014) (stating that ''[n]o tort liability is recognized when a product fails to perform or causes damage to itself in a manner that produces pure economic loss," but implying that individuals may insure against such losses).
For issues involving liability insurance, see the American Law Institute's current project on a Restatement of Liability Insurance. As far as I can determine, the distributed discussion drafts on this project do not address the economic loss doctrine, but other drafts might.

 Majority op., ¶¶ 23, 57.

 Wis. Pharmacal Co. LLC v. Neb. Cultures of Cal., Inc., 2014 WI App 111, ¶ 20, 358 Wis. 2d 673, 856 N.W.2d 505 (emphasis omitted).

 "Physical injury to tangible property" refers to " 'some sort of physical damage' to property, such as 'an alteration in appearance, shape, color, or in other material dimension.'" Gen. Cas. Co. of Wis. v. Rainbow Insulators, Inc., No. 2010AP347, unpublished slip op., ¶ 14 (Wis. Ct. App. Mar. 31, *273 2011) (quoting Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶ 31, 233 Wis. 2d 314, 607 N.W.2d 314; Travelers Ins. Co. v. Eljer Mfg., Inc., 757 N.E.2d 481, 502 (Ill. 2001)).

 See Wis. Pharmacal, 358 Wis. 2d 673, ¶ 20.

 Nat'l Union Fire Ins. Co. v. Terra Indus., Inc., 346 F.3d 1160, 1165 (8th Cir. 2003) (collecting cases).

 Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc., 78 Cal. App. 4th 847, 865 (Ct. App. 2000).

 Shade Foods, 78 Cal. App. 4th at 866.

 Wis. Pharmacal, 358 Wis. 2d 673, ¶ 20 (emphasis omitted); see also Aetna Cas. & Sur. Co. v. M&S Indus., Inc., 827 P.2d 321, 326 (Wash. Ct. App. 1992); Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc., No. 5:00-CV-149-OC-10GRJ, 2002 WL 1433728, at *3 (M.D. Fla. Feb. 11, 2002).

 Majority op., ¶¶ 51, 69.

 Am. Girl, 268 Wis. 2d 16, ¶ 37 (quoting Webster's Third New International Dictionary of the English Language 11 (2002)).

 Wis. Pharmacal, 358 Wis. 2d 673, ¶ 26.

 Majority op., ¶ 73.

 Pryor, supra note 21, at 915-16.

 Majority op., ¶ 77.

 Majority op., ¶ 78.

 Majority op., ¶ 80.

 Wis. Pharmacal, 358 Wis. 2d 673, ¶ 20.

 See September 21, 2015 Letter from Justice Annette K. Ziegler to the parties and the justices filed in the correspondence file of the instant case maintained by the Clerk of the Supreme Court: "I am writing to advise you of my decision to withdraw from further participation in this case."